## In re MATTHEWS (McDONALD, Intervener).

### (District Court, W. D. Arkansas, Ft. Smith Division. June 10, 1901.)

1. BANKRUPTCY—JURISDICTION OF REFEREE—CONSENT.

A referee to whom a bankruptcy case has been referred generally has jurisdiction, on petition of the trustee to enjoin the sale of property of the bankrupt by one of a number of lienholders, to order its sale free of incumbrances, and to settle the priority of liens, where all the parties in interest voluntarily appear, and submit the controversies between them to his decision, without objection. Such a proceeding is one proper to be had before the referee instead of the court, under general orders No. 12, and jurisdiction is conferred by the same consent which would be sufficient to confer it upon the court under Bankr. Act 1898, § 23b, and cannot be objected to by a party so consenting for the first time in proceedings to review the decision of the referee.

2. STATUTES—RULES OF CONSTRUCTION.

In construing a statute, the intent of the legislature is always a proper matter to be considered; and, where any uncertainty exists as to the meaning of its language, such intent is controlling, and that construction should be given which accords with the general spirit of the enactment, and harmonizes its provisions.

3. MECHANICS' LIENS—PRIORITY OVER MORTGAGE—ARKANSAS STATUTE.

The mechanic's lien law of Arkansas (Acts 1895, p. 217) gives mechanics, laborers, and material men a lien on the buildings or improvements made and the land on which they stand superior to any other lien or incumbrance which shall attach subsequent to the commencement of such building or improvement. It also provides (section 3) that such lien shall have preference as to the building or improvement over any prior lien or incumbrance or mortgage on the land, "provided, however, that in all cases where said prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections improvements or buildings, then said lien shall be prior to the lien given by this act." *Held*, that the effect of such proviso was to give priority to a mortgagee over mechanics or material men only when the mortgage was given for the purpose of raising money which was actually used in making the erections, improvements, or buildings on the land, and that such a mortgage is entitled to priority only to the extent that the proceeds were so used.

4. SAME—ESTOPPEL.

Where a lumber dealer, who had refused to sell lumber to a person, did subsequently furnish him with materials to be used in the erection of a building on a lot on the assurance of the agent of a mortgagee of such lot that he held a sum of money for his principal, the proceeds of the mortgage, to be used in the erection of the building, which statement was true, and that he would see that the materials were paid for, but they were not in fact paid for in full, and the agent thereafter paid over a part of the proceeds of the mortgage to the mortgagor, the mortgagee is estopped to deny priority to a mechanic's lien filed upon the property by the material man for the balance due him.

In Bankruptcy. On review of decision of referee on a petition filed by A. A. McDonald, trustee.

The record in this case shows that a petition in bankruptcy was filed against Joe P. Matthews, bankrupt, on the 13th of October, 1899, and service was immediately issued and had. He was not adjudicated a bankrupt, however, until March 9, 1900. In the meantime, on the 20th of November, 1899, the property now in controversy (it being real estate) was turned over by the bankrupt to Harry E. Kelly, as agent for Elihu Chauncey, Charles Chauncey, and William L. Savage, trustees, and was in his possession as such agent when Matthews was adjudicated a bankrupt. In his schedule

Matthews sets forth this property, describing it as "Lot No. 7, block 530. Reserve addition to the city of Ft. Smith," and also sets forth that the same is incumbered by a lien of Ed Thomas for material and labor for $100, a lien of J. M. Tenny for the sum of $244, lien of D. J. Young for $100, lien of Dyke Bros. for $325, and a mortgage to Elihu Chauncey and others, trustees, $4,000. It appears from the record that on the 28th day of April, 1899, Elihu Chauncey, Charles Chauncey, and William Littleton Savage, as trustees, loaned Joe P. Matthews the sum of $4,000 on lot 7, block 530, in the city of Ft. Smith, Ark. Matthews borrowed the money with the avowed purpose of using it to put up a wholesale storehouse upon said property, worth $5,500, and stated at the time he borrowed the money that the lot was worth $2,500. Said trustees loaned the money with the understanding that it was to be used for the same purpose. The mortgage was placed on record on the 29th day of April, 1899. In making this loan Matthews procured Harry E. Kelly, paying him a commission of $200 to make it. Harry E. Kelly was at the time, and had been for at least 10 years past, the general agent of the trustees aforesaid. When the mortgages and notes were executed and placed on record, they were sent on by Kelly to said trustees, who forwarded the money to Kelly about the 15th of May, 1899. While Kelly, on the 29th of April, had credited Matthews on his books with the $4,000 loan, he never, in point of fact, turned over the $4,000 to Matthews at all, but kept it under his own control, and paid all of it out (as had been his previous custom in transacting business for said trustees) to the contractors, laborers, mechanics, and material men who constructed the building, except the sum of $1,000, which he disbursed as follows: $300 of it he gave to his clerk and brother-in-law, who had a lien upon the lot for the balance of the purchase money to that amount; $200 of it he took out as his commission for making the loan for Matthews; and $500 of it he turned over to Matthews with the understanding that it was to be paid to one of the material men, but it was never paid to him. So that $1,000 of the borrowed money, so far as the proof shows, never went into the building at all. In holding this money, and disbursing it in the way in which he did, the court finds, as a matter of fact, that Harry E. Kelly was the agent and representative of the trustees. On the dates, and for the amounts set opposite their respective names, the following material men procured judgments in the state circuit court for material furnished and which went into said building, to wit: J. M. Tenny & Co., October 5, 1899, $268; H. I. Goddard, November 2, 1899, $188; Dyke Bros., October 5, 1899, $331.30. These judgments were all filed and allowed in the bankrupt court. Shortly after Matthews went into bankruptcy, the trustees aforesaid, who made the Matthews loan, assigned the mortgage and note to Harry E. Kelly, their general agent at Ft. Smith, for the purpose of collection. He advertised the property for sale under the mortgage, and is now in possession thereof. A. A. McDonald, the trustee in bankruptcy for Matthews, though not in possession of the property, thereupon filed a petition before the referee, setting up the existence of the mortgage, and the existence of the several mechanics' liens hereinbefore stated, and other liens also, on said property, and represented to the court that the sale of the property, under such circumstances, would not bring its real value, and prayed the court that all interested parties have notice, and for an order directing the sale of the property free from all incumbrances, and that the proceeds of said sale stand in lieu of said property, and for the bringing in of the proceeds of said sale to be distributed as the court might determine the priority of said lienholders; and also for a restraining order prohibiting the said Kelly from selling said property, or any part thereof, under said mortgage, until the matters presented were properly adjudicated in that proceeding. Thereupon an arrangement was made, whereby it was agreed by and betweeen counsel for the said Chaunceys and Savage, and the counsel for said trustee in bankruptcy, and the counsel for J. M. Tenny & Co., Dyke Bros., and H. I. Goddard "that the said Chaunceys and Savage, and the creditors of the bankrupt above named, would, in response to the petition of said trustee, file with and before the referee in bankruptcy their respective interventions, setting up their re-

spective claims of priority of liens upon the property above described; that no injunction should issue upon the petition of the said trustee; and that no sale of the property should be had until the rights of the respective parties had been determined upon said interventions." And thereupon each of the interveners, in accordance with this agreement, filed their respective interventions in response to the application of said trustee before the referee in bankruptcy. The intervention of the said Elihu Chauncey, Charles Chauncey, and William L. Savage, trustees, is in the following language:

"Come now Elihu Chauncey, Charles Chauncey, and William L. Savage, trustees, and show that heretofore, to wit, on April 28, 1899, they loaned to the said Joe P. Matthews $4,000.00, and took as security therefor a mortgage upon lot 7, in block 530, Reserve addition to Fort Smith, Ark., dated on that day, and duly acknowledged and recorded in the office of the circuit clerk and ex officio recorder of said county of Sebastian, Arkansas, in the Fort Smith district thereof, on April 29, 1899, on page 4 of Book 22 of Mortgages. Said mortgage was due in five years from date, with interest at seven per cent. per annum, and is now unpaid. Said loan was made to said Matthews to enable him to erect a building upon said lot for business purposes, and for that purpose only, and said mortgage was so given and received for the purpose of raising money with which to build upon said premises. Said money was, as these interveners are informed and believed, actually used in the erection by said Matthews of the building now standing upon said lot, and said mortgage is a first lien on said premises. Wherefore these petitioners pray that they may be adjudged to have a first and prior lien upon said premises.

"Mechem & Bryant, Attorneys for Interveners."

The other interveners, J. M. Tenny & Co., H. I. Goddard, and Dyke Bros., also filed interventions, setting up their liens as mechanics and material men, and prayed to have their liens declared prior to that of the said mortgagees. Thereupon all of the parties appeared before the referee, their testimony was taken, and the case was argued and submitted to the referee, who rendered his decision thereupon, holding that the lien of the mortgage of the said Chaunceys and Savage upon the property was prior to that of the other interveners, and ordered that the trustee in bankruptcy proceed to sell the property, and bring the funds into court, and that, when said fund is so brought into court, the proceeds be applied—First, to the expense of the sale; second, to the payment of the mortgage indebtedness, less the amounts received by the mortgagees for rent; and the remainder applied pro rata to the claims of the other interveners. From this decision and order of the referee the interveners J. M. Tenny & Co., H. I. Goddard, and Dyke Bros. filed their petition for review, and assigned as error: First, that the said referee erred in holding that the evidence was not sufficient to postpone the lien of said mortgage to the mechanics' and material men's liens of the said creditors; second, that the said referee erred in holding that said mortgage lien should not be postponed to the respective liens of said creditors to the extent of the money arising from said mortgage, and not applied to the payment of claims of said creditors for labor performed and materials furnished in the construction of the buildings on said lots. The Chaunceys and Savage, as trustees, and the other creditors, except Dyke Bros., J. M. Tenny & Co., and H. I. Goddard, submitted to the decision and order of the referee, and have not asked to have the same reviewed.

As to the claim of Dyke Bros., Mr. —— Dyke testifies that, after he made the contract for the furnishing of this lumber, and before he furnished any portion of it, he called on Mr. Kelly, in pursuance of a previous understanding between them to the effect that, when the Chaunceys were furnishing money through him to construct buildings, he (Kelly) desired Dyke Bros. to always notify him of the amount of the contract; and that heretofore he had always reserved the money for them, and that that is the reason why he called on Kelly in the Matthews case; that, in pursuance of this understanding, he called on Kelly in the Matthews case, and told him that his bill of lumber would be about $400, and Kelly said to him

that he had $1,500 in his hands, belonging to Matthews, and that he would see that he (Dyke) should get his money; that he would not have furnished the lumber at all for Matthews, because he had refused him, not more than about a month before that, lumber to go into his residence; that he furnished the lumber to Matthews, relying on the statement made by Kelly. It was further shown in proof that in this very case two payments were made to Dyke Bros. of $100 each, one of which came direct from Kelly; that this was done, as was the usual custom, by getting an estimate from the architect, and getting Matthews to sign it, and then taking it to Kelly, whereupon Kelly paid it. Dyke further testified that it was a rule of his firm to always go to Kelly when he knew that Kelly was furnishing money to build houses. Kelly denies that before Dyke furnished any of the lumber he came to him, and told him what his bill would be, and that he replied to him that he had $1,500 of Matthews' money in hand, and that he would see that they got their bill out of it; and stated that he never knew that Dyke Bros. had any interest in the concern until they came to him for $100 that was paid to them on the 29th day of July. He says he remembers distinctly he was surprised, because he had understood that all the lumber was to come from Tenny. He does not deny any of the other statements made by Dyke. There is a direct conflict between Kelly and Tenny as to what took place between them, but it does not appear from Tenny's testimony that he furnished any portion of this lumber because of any statements made by Kelly to him, or that he would not have furnished the lumber at all but for those statements. It is unnecessary, therefore, to state more fully the testimony as it relates to the Tenny claim. As to the claim of Goddard, there is no testimony showing that he furnished any of the material referred to upon any promise or statement made by Kelly, or that he ever obligated himself by any promise to see that he (Goddard) was paid. Any further facts that may be necessary will be stated in the opinion.

Mechem & Bryant, for interveners Elihu and Charles Chauncey and Wm. L. Savage.

Ira D. Oglesby, for interveners Dyke Bros. and J. M. Tenny & Co.

F. A. Youmans, for intervener H. I. Goddard.

A. A. McDonald, pro se.

ROGERS, District Judge (after stating the facts). At the threshold of this case is the question of jurisdiction in the referee, since, if he had no jurisdiction, the court could acquire none on petition for review, except to order the proceeding dismissed for want of jurisdiction. This question was not raised on the hearing before the referee, nor was it raised by the counsel on either side at the submission of the petition for review in this court. The question suggested itself, however, to the court at the hearing, and it was called to the attention of counsel, who did not seem disposed to question the jurisdiction. When the court came to examine the case, after submission, it seemed so important that the attention of counsel was again called to it, and then the question for the first time was argued, and subsequently briefed. The counsel for Savage and the Chaunceys insist that the court was without jurisdiction, because the referee had none. The question is not without difficulty, and I have considered it very carefully. Section 1, par. 7, of the bankrupt law of July 1, 1898, says:

"'Court,' as used in the statute, shall mean the court of bankruptcy in which the proceedings are pending, and may include the referee."

Section 22a of the bankrupt law provides:

"After a person has been adjudged a bankrupt, the judge may cause the trustee to proceed with the administration of the estate, or refer it (1) generally to the referee, or specially, with only limited authority to act in the premises, or to consider and report upon specified issues."

In this case, after Matthews was adjudicated a bankrupt, the whole case was referred generally to the referee for this referee district, in accordance with form No. 14 (32 C. C. A. lix., 89 Fed. xxxv.) prescribed by the supreme court of the United States. By rule 12 of the supreme court (18 Sup. Ct. vi.) it is provided that:

"The order referring the case to a referee shall name a day upon which the bankrupt shall attend before the referee; and from that day the bankrupt shall be subject to the orders of the court in all matters relating to his bankruptcy, and may receive from the referee protection against arrest, to continue until the final adjudication on his application for a discharge, unless suspended or vacated by order of the court. A copy of the order shall forthwith be sent by mail to the referee, or delivered to him personally by the clerk or other officer of the court. And thereafter all proceedings, except such as are required by the act, or by these general orders to be had before the judge, shall be had before the referee."

Such was the status of the case when the trustee in bankruptcy filed the petition to enjoin the sale under the mortgage, to have the sale made free from incumbrances, and to settle the priority of liens. In the purpose of this petition all parties acquiesced, and in the intervention of the Chaunceys and Savage, trustees, nothing is said as to who was in possession of the property. They simply assert their mortgage, and insist upon its priority over the liens of the other interveners, and pray they be adjudged to have a prior lien in the property; and, as stated, this was done in pursuance of an arrangement in which all parties to this proceeding having liens agreed that they would, in response to the trustee's petition, file, before the referee in bankruptcy, their interventions setting up their respective liens, and that no injunction issue, and no sale be had, until the rights of the respective parties had been determined by said intervention. It is clear, therefore, that, so far as all the interveners could do so, they have consented to the jurisdiction of the referee, and submitted themselves thereto. Clearly, if the proceedings had been begun by the trustee in the bankruptcy court, under section 23b, Bankr. Law, to recover the property from the mortgagees, instead of this proceeding to sell and settle priorities before the referee, the consent required by that section would be conclusively established, and all the interveners estopped to raise any question of jurisdiction. Hicks v. Knost, 178 U. S. 541, 20 Sup. Ct. 1006, 44 L. Ed. 1183; Stickney v. Wilt, 23 Wall. 150, 23 L. Ed. 50; In re Connolly (D. C.) 100 Fed. 620. The trustee, however, treated the property as all under the control of the bankrupt court, and the Chaunceys and Savage acquiesced. From any point of view, the trustee did acquire an equity of redemption in the property, and had a right to apply for its sale, without reference to who had possession; and it was agreed and acquiesced in by all parties that, in view of the numerous liens, the priorities of which were

in dispute, it should be sold free from all liens by the trustee, and the money brought into court, to be distributed as their equities might be adjudged. The referee made the order that the trustee proceed to sell the property free from all incumbrances, and bring the fund into court; and all parties have acquiesced in that part of the order relating to the sale, no review having been sought as to that. That order is the law of this case, unless the referee was without power to make it.

Two questions remain. Had the referee the power to order the sale, free from liens, all parties submitting to the jurisdiction for that purpose? Second. Had he the power to settle the priorities between the lienholders? Both questions will be considered together. It may be remarked in the outset that, so far as the court has been able to find, there is nothing in the bankrupt law, and nothing in the rules promulgated by the supreme court, which contravene the last paragraph of section 1 of rule 12 (18 Sup. Ct. vi.), wherein it is stated: "And thereafter [meaning after the case has been referred] all the proceedings, except such as are required by the act, or by these general orders, to be had before the judge, shall be had before the referee." So that it would seem that, independent of any other authority, the power would exist in the referee, not only to make the sale, free from liens, where the parties had submitted themselves to his jurisdiction, but also to declare the priorities. But we are not without authority upon this question. The supreme court, in White v. Schloerb, 178 U. S. 542, 20 Sup. Ct. 1007, 44 L. Ed. 1183, says:

"Referees in bankruptcy are appointed by the courts of bankruptcy, and take the same oaths of office as judges of the United States courts. Each case in bankruptcy is referred by a court of bankruptcy to a referee, and he exercises much of the judicial authority of that court."

It is the universal practice in this jurisdiction, and everywhere, so far as the court is advised, for the referees to order sales of property; and forms Nos. 42 to 46, inclusive (32 C. C. A. lxxiii.–lxxv., 89 Fed. xlix.–li.), promulgated by the supreme court, all contemplate that these sales shall be made under orders of the referee. By rule 18 (18 Sup. Ct. vi.), when private sales are ordered and made, the report must be made to the referee. In Coll. Bankr. (3d Ed.) p. 475, the author says that a majority of cases under the present act hold that the court, including the referee, has power to order the sale of land free of incumbrances, and that the proceeds are to stand as a substitute for the liens themselves for the benefit of those holding liens to the extent of their interest therein, and the surplus goes to the general creditors. By section 38a (4) it is provided:

"Referees respectively are hereby invested, subject, always, to a review by the judge, within the limits of their districts as established from time to time, with jurisdiction to * * * (4) perform such part of the duties, except as to questions arising out of the applications of bankrupts for compositions or discharges, as are by this act conferred on courts of bankruptcy, and as shall be prescribed by rules or orders of the courts of bankruptcy for their respective districts, except as herein otherwise provided."

And by section 1a (8):

"Courts of bankruptcy shall include the district courts of the United States and of the territories, the supreme court of the District of Columbia, and the United States court in the Indian Territory and of Alaska."

In re Worland (D. C.) 92 Fed. 893, is a case which seems absolutly in point. In that case there was conflicting liens, and a petition was filed by the trustee before the referee for an order directing the sale of the realty and certain machinery situate thereon, and asking that the latter should be sold separately, the proceeds to be applied to the payment of the debts secured by the chattel mortgage. One mortgage was upon the property, including the building, ground, and machinery; another was a mortgage on a stock of lumber and other material, and on tools, machinery, engine, boiler, gearing, shafting, and belting upon the same premises; and the third was a judgment lien. The matter was heard and determined by the referee, and duly certified to the district court for review. Judge Shiras held, in substance, that, where the estate of a bankrupt includes real property, subject to the liens of valid mortgages and judgments, the court may order it sold by the trustee in bankruptcy, free of incumbrances, the liens being transferred to the proceeds of the sale; and may direct the method of sale and distribution so as to protect the rights and interests of all parties concerned.

In re Emrich (D. C.) 101 Fed. 231, was a case where an order was taken before the referee to compel the wife of the bankrupt to surrender a license to occupy a stall in the city market. She appeared before the referee, and, without raising the question of jurisdiction, filed an answer, in which she averred that the license in question was a mere personal privilege; that it was not a right which passed to the trustee. The referee held otherwise, and his judgment was affirmed by the district court. In that case she raised no question of jurisdiction before the referee until he had found against her. She afterwards insisted, before the court, on review, not that the conclusion reached by the referee was wrong, but that the referee had no jurisdiction of the case presented. The court held otherwise, declining to say whether he would have entertained jurisdiction of the matter if she had, in apt time, objected to the jurisdiction of the court, and says:

"Whether she could thus be brought in by rule, and her claim determined by this means, if objected to, is a question not now before us, and upon which we express no opinion. Suffice it to say, she has submitted herself to the jurisdiction of the court, has invited its action upon her rights, and, having taken the chance of a favorable decision of the referee, she cannot now, for the first time, complain of lack of jurisdiction when the decision is adverse. Mays v. Fritton, 20 Wall. 418, 22 L. Ed. 389; Adams' Appeal, 113 Pa. 454, 6 Atl. 100; Edgett v. Douglass, 144 Pa. 100, 22 Atl. 868, 12 Enc. Pl. & Prac. 191."

The bankrupt in that case was ordered to execute and deliver to the trustee in bankruptcy a transfer and assignment of the license. The last case cited seems to be as strongly in point as it can be. Savage and the Chaunceys, having submitted themselves to the jurisdiction of the court, and invited its action upon their

rights, and having obtained a favorable decision by the referee, cannot now, for the first time, be heard to complain of the lack of jurisdiction. And especially is this true since the question itself is not raised by the pleadings, and only incidentally by the testimony of their agent.

The next question in this case is whether or not the mechanics' liens herein referred to have priority over the mortgage lien of the Chaunceys. The Chaunceys' mortgage was placed upon record before this building was begun. The mechanic's lien law now in force in this state was approved April 20, 1895, and is found in the Acts of 1895, at page 217. I have had no little trouble in determining the construction of this act. This act repealed the mechanic's lien law found in Sandels & Hill's Digest, beginning with section 4731. The legislature had some object in repealing this law. It is well to inquire what it was. That part of the act which tends to throw light upon the act of April 20, 1895, is found in section 4737, Sand. & H. Dig. It reads as follows:

"Sec. 4737. The liens for work or labor done, or things furnished, shall be paid pro rata, except that the lien of a sub-contractor shall be preferred to that of a contractor. Liens under this act shall be preferred to all other liens and incumbrances attached to or upon such building, erection or other improvement, and to the land on which the same is situated, made subsequent to the commencement of such building, erection or other improvement."

This section of the statute, giving liens to mechanics, laborers, and persons furnishing material for the construction of a building priority over liens and incumbrances made subsequent to the commencement of such building, erection, or other improvement, was construed by the supreme court of Arkansas in Apperson v. Farrell, 56 Ark. 640, 20 S. W. 514, and upheld. That court, among other cases which they cited as supporting the decision of Apperson v. Farrell, referred to Davis v. Bilsand, 18 Wall. 659, 21 L. Ed. 969. In that case the supreme court of the United States, in construing a similar statute existing in Montana, said:

"The lien secured to the mechanics and material men have precedence over all other incumbrances put upon the property after the commencement of the building. And this is just. Why should a purchaser or lender have the benefit of the labor and materials which go into the property and give it its existence and value? At all events, the law is clear, and the decree was right."

It will therefore be seen that mechanics, laborers, and material men had a prior lien upon the improvements, as well as the land on which the same were situated, over a mortgagee whose mortgage was made subsequent to the commencement of the building, erection, or improvement. And this same provision is found in section 5 of the act approved April 20, 1895, found in the Acts of 1895, at page 221. It reads as follows:

"Sec. 5. The lien for work and materials as aforesaid shall be preferred to all other incumbrances which may be attached to or upon such buildings, bridges, boats, vessels or other improvements, or the ground, or either of them, subsequent to the commencement of such buildings or improvement."

The only difference between this section of the act of 1895 and section 4737 of Sandels & Hill's Digest is that the liens are extended over bridges, boats, and vessels. In other respects the substance of section 5 is the same as the substance of section 4737, Sand. & H. Dig., so far as it relates to the priority of liens. Section 5, therefore, enlarges the protection of the laborer, mechanic, and material man. It is clear, therefore, without looking further at the act of 1895, that it was the intention of the legislature to further extend protection to these classes of people. Section 3, however, of that act, is the one upon the interpretation of which this case must turn. That section is as follows:

"The lien for the things aforesaid, or work, shall attach to the buildings, erections or other improvements, for which they were furnished or work was done, in preference to any prior lien or encumbrance or mortgage existing upon said land before said buildings, erections, improvements or machinery were erected or put thereon, and any person enforcing such lien may have such building, erection or improvement sold under execution, and the purchaser may remove the same within a reasonable time thereafter; provided, however, that in all cases where said prior lien or encumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements or buildings, then said lien shall be prior to the lien given by this act."

Omitting any notice for the present of the proviso to that section, what was the purpose of the legislature in adding that section to section 5? By section 5, which is the same in substance as section 4737, Sand. & H. Dig., as interpreted in Apperson v. Farrell, 56 Ark. 640, 20 S. W. 514, if a mortgagee took a mortgage upon premises upon which a building was being erected, his mortgage was postponed to the liens of the men who did the work and furnished the material; and in that case the lien of the men who did the work or furnished the material to improve it extended not only to the improvements, but also to the land. In section 3 the rule is different. In that section the legislature extended to the men who furnished the material and did the work upon improvements on land upon which a mortgage existed before the improvements or erection of the buildings were made,—a lien, not upon the land covered by the mortgage which was made before any work or improvement was done upon it, but on the improvements,—and gave them the right to sell the same, and the purchaser the right to remove them from the premises; so that, where a mortgagee held a mortgage upon a piece of land upon which the owner thereof afterwards procured mechanics and laborers to construct a building, and material men to furnish the material with which to construct it, if the mechanics, laborers, and material men enforced their lien as the statute provided, the mortgagee still had his mortgage upon the land, but the mechanic, the laborer, and the material men had their liens fixed upon the improvement, which their own labor and material had constructed. This section, therefore, went further than section 5, and further than section 4737 of Sandels & Hill's Digest, in this: that, without reference to when the mortgage was made, whether before or after the buildings, erections, or improvements were begun, the mechanic, laborer, and material man were

given their lien on the improvements constructed by them. This was the manifest purpose of the enacting part of that section of the statute. Section 3 was, therefore, an extension of additional protection to mechanics, laborers, and material men, and not a restriction of their protection under the law as it stood when the act of April 20, 1895, was approved. And it may be remarked that, while this sort of a proceeding might be very inconvenient at times, yet it was just, for why, in the language of the supreme court of the United States in Davis v. Bilsand, supra, should a purchaser or lender have the benefit of the labor and material which go into the property and give it its existence and value? The difficulty, however, does not arise in construing that part of the section preceding the proviso. The difficulty is in the proviso itself. Two contentions are made. The mortgagees, through their counsel, insist that, if it is shown dehors the mortgage that the mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements, or buildings, then the mortgagee's lien shall have priority over the mechanics', laborers', and material men's liens, although not a dollar of the money so raised by the mortgage ever went into the construction of the improvement. Why should a mortgagee, having a mortgage to secure money which he had loaned for the purpose of constructing buildings, erections, or improvements, but not a dollar of which ever went into the construction of the buildings, erections, or improvements, have any advantage over a mortgagee who had a simple mortgage upon the land, made without reference to what was to be done with the money loaned? Can there be any possible difference? In neither event does any portion of the money go into the construction of the buildings or improvements on the land. It will be seen in a moment that such a construction as this absolutely nullifies that part of the section preceding the proviso. Is it to be supposed that the legislature intended to defeat the lien given by that part of the section which precedes the proviso to the mechanic, laborer, and material men by simply permitting the mortgagor and the mortgagee to state that the mortgage was given for the purpose of making improvements upon the land? It will be observed that there is no limitation as to what time the mortgage is made with reference to what time the improvements are made. The mortgage may have been executed and recorded five years before the material was furnished, or any mechanic or laborer had done any work upon the improvements thereon; or it may have been made and executed one day before. The purpose for which it is done is a matter exclusively within the knowledge of the mortgagor and mortgagee, and no laborer, mechanic, or material man has any right or authority, under the statute, to apply to either the one or the other to ascertain for what purpose the mortgage upon the property was made or executed; nor would the mortgagor or the mortgagee be under any obligations to give a truthful answer, or any kind of an answer, thereto. So that, if the contention of the mortgagee in this case is correct, the mortgagor having given his mortgage with the distinct understanding between himself and the

mortgagee that the money was to be used for the purpose of making improvements or buildings, the lien of the material men, the mechanic, and the laborer would be defeated, without reference to whether one dollar of the funds thus raised ever went into the building or not, and the beneficent provisions of the first part of the section would be utterly destroyed. No laborer, mechanic, or material man, under that construction, could ever ascertain, with any degree of certainty, as to whether or not they could furnish the material, and do the work, and secure a lien upon the property therefor. They would be entirely at the mercy of the mortgagor and the mortgagee. But did the legislature intend any such construction as that? Or did the legislature intend by this provision of the statute to defeat the construction of buildings upon real estate? Upon the contrary, the manifest purpose of the statute was to protect those persons who would furnish lumber and do work in the construction of buildings, thereby giving encouragement to the construction of buildings on unimproved property, and at the same time secure to the money lender who was willing to advance money for the purpose of constructing the building a priority over them in the event he conformed to the provisions of the statute.

The second contention is that, in order for the mortgagee to acquire a prior lien as against the material men, the mechanic, and the laborer, there must be a recital in the mortgage to the effect that the money was raised for the purpose of making the erection, improvements, or buildings. But what good would a "recital in the mortgage" to that effect do the mechanic, the laborer, or the material men who constructed the building, unless the money so raised went into the building? Moreover, what is the use of a recital in the mortgage to that effect, when, as in this case, at least one of the material men knew that the mortgage had been given for the purpose of constructing the very building upon which their lien exists? And in the case at bar common sense would teach them all the same thing, because, as shown by the proof, the loan made on the property was nearly twice the value of the vacant lot,—in point of fact, it was nearer four times its value. If, however, the money raised by the mortgage for the purpose of erecting the building went into the building, it tended to make the property security, not only for the mortgagee, but for the material men, the mechanic, and the laborer. Actual notice that a mortgage is given for a certain purpose ought to be equivalent to a recital in the face of the mortgage to that effect. And, if neither actual notice nor a recital in the face of the mortgage could be of any possible service to either the mechanic, the laborer, or the material furnisher unless the money itself went into the building, of what use would the notice be, or what other good purpose would such a recital subserve? It might be said that, if the recital in the face of the mortgage gave notice of the fact that the mortgagee had a prior lien, that the material men, the laborer, and the mechanic would not then construct the building at all until the mortgagee or the builder made some provision for their payment. The tendency of this is to defeat the construction of buildings at all, which could not

have been the legislative purpose. Besides, if all that was necessary upon the part of the mortgagee was to have a recital in his mortgage that it had been given to raise money to make improvements in order to secure a priority of lien as against mechanics, material men, and laborers, and no duty rested upon him to see that the money raised by his mortgage for erections, improvements, or buildings went into such erections, improvements, or buildings, then the effect of the statute would be to induce the laborers, material furnishers, and mechanics to enhance the security of the mortgagee, while in point of fact, as we have seen, the very object of the legislature in passing that part of section 3 which precedes the proviso was to secure the mechanic, the laborer, and the material furnisher a lien upon the structures which their material and labor produced. In other words, it was not the object of the legislature to enhance the security of the mortgagee. It was the object of the legislature to protect the material furnisher, the laborer, and the mechanic. The office of a proviso, generally, is either to except something from the enacting clause, to restrain its generality, or to exclude some possible ground of interpretation of it, as extending to cases not intended by the legislature to be brought within its purview. Minis v. U. S., 15 Pet. 423, 10 L. Ed. 791; Wayman v. Southard, 10 Wheat. 1, 6 L. Ed. 253. A proviso in a statute is to be strictly construed. It takes no case out of the enacting clause which is not fairly within the terms of the proviso. U. S. v. Dickon, 15 Pet. 141, 10 L. Ed. 689. A corollary to this proposition is that no proviso should be construed so as to destroy the enacting clause, for it is fundamental in the construction of statutes that, if possible, a statute should be so construed as that all parts of it shall stand. What was this proviso intended to carve out of the enacting part of the statute? How can it be construed so as to promote the purposes of the legislature? How shall it be construed so as to do justice between all the parties? It seems to me, notwithstanding the inaptness, the looseness, and ambiguity of the language used in the proviso, that the object and purpose of the legislature was to carve out of the enacting part of the statute only that class of cases where the funds raised by a mortgage had not only been raised for the purpose, but in fact had gone into the buildings, erections, and improvements on the land covered by the mortgage. Such a construction protects the mortgagee to the full extent of his mortgage. Such a construction tends to enhance the value of the property covered by the mortgage, and pro tanto to increase the chances and opportunities of the laborer, the material man, and the mechanic to get pay for the labor which they bestow and the material furnished. Such a construction takes nothing away from the mortgagee, but it adds to the security of the material man, the laborer, and the mechanic; and such a construction permits the enacting part of the statute to remain in full force as to all cases where the mortgagee has not looked to it to see that the money raised upon his mortgage went into the improvement; and such a construction leaves section 5 of the statute in full force,

and is sustained by the latter half of section 10 of the act approved April 20, 1895, which reads as follows:

"The owner or proprietor, or any one interested in the buildings or grounds, as mortgagee or trustee, upon which improvements are made under this act, may at any time apply to the contractor or sub-contractor for a list of all parties doing work or furnishing material for said buildings, and the amount due to each of said persons; and any such contractor or sub-contractor refusing or failing to give a correct list of such parties furnishing material or doing labor, and the amount due to each on such buildings, shall be guilty of a misdemeanor, and shall be punished by a fine not exceeding five hundred dollars."

It is the cardinal rule of interpretation that a statute should be construed not only so that every part of it should stand, but so as to give force, meaning, and effect to every part of it. What object or purpose could the legislature have had in view in enacting this latter clause of section 10, if no duty rested upon the mortgagee or trustee to see that the money raised to 'construct improvements went into the improvements? Why should the mortgagee or trustee be given authority to demand of a contractor or subcontractor a list of all parties doing work or furnishing material for buildings upon which he had a mortgage, unless it was to ascertain whether or not such persons had been paid, and to see to it that money which had been raised upon his mortgage, before it went into the hands of the contractor or subcontractor, should go to parties doing work and furnishing material upon said building? It will be observed that no power is conferred upon the mechanic, the laborer, or the material furnisher to make such a demand of the mortgagee or trustee, or upon the owner or the proprietor, or any one interested in the buildings or ground. Only one answer to this question can be made. This power was conferred to enable the owner, mortgagee, or trustee to protect himself against the liens of material men, laborers, and mechanics,—liens which had been conferred by the first two sections of the act, and the priorities of which the legislature had undertaken to determine by the third and fifth sections of the act.

If it be said that this conclusion is not construction, but judicial legislation, it may be remarked that in this very case the proof shows conclusively, to the mind of the court, that Mr. Kelly, as the agent of the Chaunceys, interpreted this act just as the court has interpreted it; for he retained the borrowed money in this case for the purpose of disbursing it, and did disburse it, except to the extent of about $1,000, to the very persons who furnished the material and did the work upon the building in controversy. In the testimony of Mr. Kelly he says:

"On April 27th I wrote to Elihu Chauncey: 'Yours of the 24th is at hand. I note that you will take the $4,000 Joe Matthews loan. I will prepare the papers at once, and put him to work.'"

What does he mean by putting Joe Matthews "to work"? What had he to do with Joe Matthews going to work, unless he was to disburse the money with which Matthews was to carry on the work? If not that, all he had to do was to give Matthews the $4,000, and

let him work or not, as he chose. In another portion of his testimony he was asked:

"Q. In making loans for the Chauncey heirs or trustees to improve property upon which you took a mortgage, have you not advised them or notified them that you would see that the money was applied to improve the property according to the contract? A. I do not know that I ever advised them to that effect, but they understand that. Q. They understand, then, that when a loan is made by you to improve property, that you are to see that that money is to be applied to the purposes for which the loan is made? A. Yes."

And the checks introduced in evidence by Mr. Kelly, as showing what disposition was made of the $4,000 loan to Joe Matthews, show that only two checks, aggregating $222.45, were drawn in favor of Joe Matthews. All the other checks, with the exception of one or two small items, amounting to less than $50, were drawn either in favor of the laborers and mechanics who did the work, or the men who furnished the material for the construction of the building, with one exception, namely, a check for $500, which was drawn in favor of Matthews and O'Leary for the payment of J. M. Tenny, which amount was misappropriated by Matthews, to whom the check was delivered. So that the construction which the court has placed upon this act is manifestly the construction which the parties themselves placed upon it. Besides, nobody would assume for a moment that a competent and intelligent real-estate and money broker, or that the Chaunceys, who are large lenders of money upon real estate, would lend twice as much money upon a lot as the lot itself was worth, unless the money was to go into the improvement of the lot; and in the very written application of Matthews to Kelly to procure this loan it is recited that the lot was only worth $2,500. These significant facts, however, do not constitute a rule for the interpretation of a statute. But Mr. Sutherland, in his work on Statutory Construction, says, at paragraph 323:

"A construction which must necessarily occasion great public and private mischief must never be preferred to a construction which will occasion neither, or not in so great a degree, unless the terms of the instrument absolutely require such preference. Of two constructions, either of which is warranted by the words of the amendment or the public act, that is to be preferred which best harmonizes the amendment with the general tenor and spirit of the act amended. A statute may be construed contrary to its literal meaning when a literal construction would result in an absurdity or inconsistency, and the words are susceptible of another construction which carries out the manifest intention."

The same author, at section 218, says:

"It is indispensable, to a correct understanding of a statute, to inquire, first: What is the subject of it? What object is intended to be accomplished by it? When the subject-matter is once clearly ascertained, and its general intent, a key is found to all of its intricacies. General words may be restrained to it, and those of narrower import may be expanded to embrace it to effectuate that intent. When the intention can be collected from the statute, words may be modified, altered, or supplied so as to obviate any repugnancy or inconsistency with such intention."

Mr. Justice Field, in the Eureka Case, 4 Sawy. 302, Fed. Cas. No. 4,548, said:

"Instances without number exist where the meaning of words in a statute has been enlarged, restricted, or qualified to carry out the intention of the legislature. The inquiry, where any uncertainty exists, always is as to what the legislature intended, and, when that is ascertained, it controls."

The supreme court of Arkansas has repeatedly manifested, in the most explicit terms, the rules that should obtain in the construction of statutes in this state. They say that where the terms of a statute are ambiguous, the court, in order to ascertain their meaning, must resort to the general spirit and intent of the enactment, keeping in view its known object and the mischief intended to be remedied. Wassel v. Tunnah, 25 Ark. 101; Buckner v. Bank, 5 Ark. 536, 41 Am. Dec. 105; Davis v. Tarwater, 13 Ark. 52; McKenzie v. Murphy, 24 Ark. 155; McNair v. Williams, 28 Ark. 200; Railroad Co. v. Howell, 31 Ark. 119; State v. Smith, 40 Ark. 431; Doles v. Hilton, 48 Ark. 307, 3 S. W. 193. A statute must be so expounded that, not only every clause, but every word, shall have some operation and effect. Lytle v. State, 17 Ark. 608; Scott v. State, 22 Ark. 369; Dunn v. State, 2 Ark. 229, 35 Am. Dec. 54; Wilson v. Biscoe, 11 Ark. 44.

In McNair v. Williams, 28 Ark. 200, the court said:

"One part of a statute must be so construed by another that the whole may, if possible, stand, and that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. Less regard is to be paid to the words used than to the policy which dictated the act."

In State v. Smith, 40 Ark. 431, the court said:

"It is the duty of every court to so construe a statute as to effect the clearly expressed intention of the legislature, and not to defeat it by adhering too rigidly to its letter, or to technical rules of construction. Any construction that would lead to absurd consequences should be discarded."

Decisions might be multiplied on this subject. It is sufficient to say that these cases show that in construing statutes the fundamental rule is to get at the intention of the legislature. Mr. Sutherland says:

"No clearer statement has been or can be made of the law as to the dominating influence of the intention of a statute in the construction of all its parts than that which is found in Kent's Commentaries: 'In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms, and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion.'"

Blackstone, in his Commentaries, mentions three things which are to be considered in the construction of all remedial statutes: the old law, the mischief, and the remedy; that is, how the law stood at the making of the act, the mischief for which that law did not adequately provide, and what remedy the legislature has supplied to cure this mischief. And it is the duty of judges so to construe the act as to suppress the mischief and advance the remedy. This injunction is simply to carry out the intention of the lawmaker, which is the cardinal aim with reference to all statutes. The in-

tention in statutes which are for this purpose recognized as remedial, or enacted pro bono publico, is more liberally inferred, and to a greater extent dominates the letter, than is admissible in dealing with those which must be strictly construed. The more I have reflected upon this statute, the more I am impressed with the belief that the construction I have placed upon it was not only the meaning intended by the legislature, but it is the meaning most consonant with reason and justice. It is a construction which promotes the very purpose which the legislature had in view. It is a construction which gives force and effect to every provision of the act. And it is a construction which does equal and exact justice between all parties. It must be admitted that a construction placed upon the third section of this act which would permit a person to take a mortgage upon a piece of real estate, and five years afterwards, when both the mortgagor and the mortgagee knew that the money thus raised had been expended for other purposes than the erection of any buildings or improvements upon the land, that such a mortgage, under this statute, should have priority over mechanics, laborers, and material men whose labor and material had constructed the buildings upon it, would lead to an absurdity, nullify the enacting clause of the section, and deprive the material men, laborers, and mechanics of that protection which it was the object of the legislature to afford. I am of the opinion, therefore, that the proper construction of this statute only gives priority to the mortgagee over the mechanic, the laborer, and the material man when the mortgage was given or executed for the purpose of raising money or funds which were actually used in making the erection or improvements or buildings on the land. But, if wrong in this so far as Dyke Bros. is concerned, I am of the opinion that the Chaunceys are estopped from availing themselves of their mortgage to defeat their lien. It is true, there is a direct conflict in the evidence between Kelly and Dyke as to whether or not Kelly ever told Dkye that he had $1,500 of the Chaunceys' money in his hands belonging to Matthews, and that he would see that he (Dyke) got his money out of it. Both parties give reasons which are substantial for the testimony which they give in this respect, but there is so much in the testimony of Kelly that is evasive in relation to his connection with the Chaunceys in this matter, not to mention the fact that he is squarely contradicted along the same line by Tenny, that the court is inclined to the opinion that he ought to give credence to the testimony of Dyke. It appears from the testimony that Dyke, only a month before he claims to have had the interview with Kelly, refused to sell Matthews lumber to go into his residence; and it is not denied that, for three years prior to the time that Dyke says he had the interview above referred to with Kelly, Kelly had requested him, whenever he was furnishing lumber to go into houses upon which he held a mortgage, to advise him (Kelly) of it; and the additional fact that it had been the custom of Kelly, in representing the Chaunceys, to withhold so much of the money as was to go into the improvements from the borrower as would

satisfy the laborers, the mechanics, and the material men; and that is precisely what he undertook to do in this case, and which, doubtless, he would have accomplished but for the fact that Matthews, by devious methods, overreached him, got the money out of his possession, and then misappropriated it. Dyke also testifies that he never would have sold Matthews the lumber but for the fact of this promise made by Kelly. The court thinks that this constitutes an estoppel. But it is said that Dyke had made the contract with Kelly to furnish the lumber to Matthews before the interview took place, and, therefore, being obligated to deliver the lumber, the doctrine of estoppel would not apply. The answer to that is that the agreement to deliver the lumber is not shown to have been in writing, or that any portion of the purchase price therefor had been paid, or that any earnest money had been paid. The contract, therefore, to furnish the lumber, being for the amount of $400, and not in writing, falls clearly within the statute of frauds. Section 3470, Sand. & H. Dig. This doctrine of estoppel, however, cannot be made to apply to Tenny & Co., because the testimony shows that Tenny & Co. entered into a written contract; and, furthermore, it does not appear from his testimony that he would not have delivered the lumber but for any statement made by Kelly.

As to Goddard, no promise, implied or otherwise, existed as between Kelly and him.

The court is of opinion, therefore, that the proceeds of the property, when sold, should be distributed as follows: First. The cost and expense of the sale should be paid. Second. The claim of Dyke Bros. should be paid in full, including interest from the date of judgment to the date of payment. Third. That Elihu Chauncey, Charles Chauncey, and William L. Savage, trustees, should be paid $3,000, less any rents and profits of the property which they may have received since said Matthews was adjudicated a bankrupt. That after they have been paid, as aforesaid, the said J. M. Tenny & Co. and the said H. I. Goddard should be paid in full, with interest at 6 per cent. per annum from the date of their judgments to the date of payment, and, if the sum left over is not sufficient to pay them in full, then it should be distributed pro rata between them; but if, after they are paid in full, there is a surplus, then the same, or so much thereof as may be necessary, should be turned over to Elihu Chauncey, Charles Chauncey, and William L. Savage, or their agent or attorney of record, and any excess should be retained by the trustee for the benefit of the general creditors. And that the referee in bankruptcy should cause an accounting to be had between the trustee of said Matthews and said mortgagees of the rents and profits received by said mortgagees upon said property, so as to ascertain what was due upon said mortgage as of the date upon which said Matthews was adjudicated a bankrupt; and in making payment of the said $3,000 to the mortgagees as hereinbefore provided for any sums received by them as rents and profits since said adjudication in bankruptcy should be deducted from the sum of $3,000 hereinbefore ordered to be paid to them.