38

ROOSEVELT & SON INVESTMENT FUND, GEORGE E. ROOSEVELT, PHILIP J. ROOSEVELT, FAIRMAN R. DICK, ERMAND J. RIFFLARD AND VAN S. MERLE SMITH, AS MANAGERS, AND CHEMICAL BANK & TRUST COMPANY (FORMERLY THE CHEMICAL NATIONAL BANK OF NEW YORK), AS TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76196.   Promulgated March 6, 1936.

*Leslie D. Dawson, Esq.*, for the petitioner.
*Bruce A. Low, Esq.*, and *L. H. Rushbrook, Esq.*, for the respondent.

### OPINION.

VAN FOSSAN: This proceeding was brought to redetermine a deficiency in the income tax of the petitioner for the year 1929 in the sum of $104,000.86. The case was presented on a stipulation signed by the parties, supplemented by oral testimony.

The issues are:

(1) Whether or not the assessment and collection of the proposed deficiency are barred by the statute of limitations.

(2) Whether or not the petitioner is an association or a revocable trust.

(3) Whether or not the respondent is estopped from assessing a tax against the petitioner for the year 1929.

(4) Whether the proper amount of dividends deductible under section 23 (p) of the Revenue Act of 1928 was $200,878.83, the sum received, or $100,736.03, the sum allowed by the respondent.

(5) Whether or not the petitioner is entitled to deduct $109,010.50 paid as ordinary and necessary expenses for compensation to the managers of the investment fund.

Roosevelt & Son was a partnership, originally formed in 1797. For over 130 years it has engaged in business as a partnership, dealing for many years in investment securities. For two generations prior to 1927 its principal business was caring for other people's money, acting as trustee under wills and deeds of trust and serving as custodian of property. In 1927 the firm was caring for 1,600 or more different issues of common stocks on behalf of several hundred beneficiaries. In order to render them more efficient service the petitioner trust was established. The question of income tax liability of the individual beneficiaries was discussed at length and the form of the trust was chosen to make the tax of each participant as nearly as possible identical with what he would have paid as an individual owner of a proportionate share of the securities held by the petitioner.

The petitioner, Roosevelt & Son Investment Fund, hereinafter sometimes called the fund, was formed pursuant to an agreement designated "Investment Trust Indenture" dated April 29, 1927, by W. Emlen Roosevelt, George E. Roosevelt, Fairman R. Dick, Philip J. Roosevelt, and Archibald B. Roosevelt, general partners of the firm of Roosevelt & Son and called "managers" in the indenture, with the Chemical National Bank of New York (now the Chemical Bank & Trust Co.) as trustee and the registered holders of participation certificates as beneficiaries. By death and resignations the personnel of the managers was changed so that George E. Roosevelt, Philip J. Roosevelt, Fairman R. Dick, Ermand J. Rifflard, and Van S. Merle Smith are now the managers of the trust.

The rights and obligations of the parties to the indenture were fixed and determined by its provisions and the fund has been administered and operated since its formation strictly in accordance with its terms. Under the indenture, certificates were issued in the following form:

[FORM OF CERTIFICATE]

No._____        $_____        $__,_____
                            (Cost Value)             (Face Value)

ROOSEVELT & SON INVESTMENT FUND

Participation Certificate

Series A

THIS IS TO CERTIFY that _____, the registered holder hereof, has paid ____,_____ Dollars ($_____), the cost value hereof, into the Investment Fund created under a certain indenture, hereinafter described, and is therefore entitled to _____ (__,____) units in said Investment Fund.

This Certificate is one of the series of Certificates, designated as Series A, issued under an Indenture (hereinafter called the Indenture), dated as of April 29, 1927, to which W. Emlen Roosevelt, George E. Roosevelt, Fairman R. Dick, Philip J. Roosevelt and Archibald B. Roosevelt (hereinafter called the Managers) and The Chemical National Bank of New York, as Trustee, and the registered holders of said Certificates are parties.

The registered holder hereof has by acceptance hereof become a party to the Indenture and is bound by all the terms and provisions thereof. A copy of the Indenture is on file at the principal office of said Trustee in the Borough of Manhattan, City of New York and there open to inspection during business hours by the registered holder hereof.

The registered holder hereof is entitled to (1) cumulative distributions upon the Face Value hereof, accruing from the date hereof, at the rate of 5% per annum, payable quarterly, and (2) such extraordinary distributions as the Managers may from time to time determine; all as provided in the Indenture.

The registered holder hereof may, subject to the terms and provisions of the Indenture, upon written demand delivered to the Trustee at least (5) days before the first business day of any month and accompanied by surrender hereof, cause the Managers to redeem this Certificate and thereby become entitled to receive from the Managers the distributive share (as defined in the Indenture) in said Investment Fund represented hereby on the first business day of the month next succeeding the month in which such demand shall be delivered to said Trustee.

The Managers, subject to the terms and provisions of the Indenture, may cause this certificate and all other Certificates outstanding under the Indenture to be redeemed on the first business day of any month, upon 30 days' notice as provided in the Indenture, by payment to the registered holders of said Certificates of the respective distributive shares represented thereby, and may cause, in particular instances, this Certificate and/or any of said Certificates to be redeemed by like payment without redeeming all of said Certificates then outstanding under the Indenture.

This Certificate is not transferable, and the registered holder hereof shall for all purposes be deemed the absolute owner hereof, and neither the Managers nor said Trustee shall be affected by any notice to the contrary, except that the registered holder hereof may, as provided in the Indenture, by the due execution and delivery of an instrument of assignment, substantially in the form endorsed on the back hereof, accompanied by delivery of this Certificate, assign the right to cause this Certificate to be redeemed and to receive from the Managers said distributive share, but notwithstanding such assignment any and all distributions payable in respect hereof shall continue to be payable to the registered holder hereof until this Certificate shall be redeemed. The assignee named in any such assignment may cause this Certificate to be redeemed upon like terms and conditions as the registered holder hereof could have caused such redemption had such assignment not been made, and in the event that the Managers after written notice of any such assignment, shall cause the redemption hereof, as provided in the Indenture, such assignee shall be entitled, upon the surrender of this Certificate accompanied by said assignment, to receive said distributive share.

*      *      *      *      *      *      *

This Certificate is not valid unless authenticated by said The Chemical National Bank of New York, as Trustee.

*      *      *      *      *      *      *

Provision was made for the redemption of the certificates either at the managers' or the holders' option. In either case redemption might be made in kind or in cash at the managers' election. The establishment of the investment fund was provided for in article 111, section 1 of the indenture, as follows:

SECTION 1. *Investment of the Investment Fund.*—The Managers shall have absolute control and management of the Investment Fund, except as herein otherwise specifically provided, and the Managers shall cause the Investment Fund to be invested and reinvested from time to time in such common and/or preferred stocks and/or in such other Securities and/or in such call and/or time loans upon collateral security consisting of Securities listed upon the New York Stock Exchange having a value at the time of the making of any such loan of not less than 20% in excess of the amount of such loan, as the Managers may in their absolute discretion deem best.

Deliveries to and from the fund were covered by the following provision:

SECTION 2. *As to Deliveries to and from the Investment Fund.*—Except as herein otherwise provided, the Managers covenant that they will not make any Order for the payment of cash and/or delivery of Securities out of the Investment Fund as the case may be except (a) upon the redemption of Certificates hereinafter provided for in Article V hereof, (b) upon substantially contemporaneous delivery to the Trustee for account of the Investment Fund of Securities, in negotiable form or to the order of the Trustee, for the purchase of which such cash shall be withdrawn, or (c) upon substantially contemporaneous deposit for the account of the Investment Fund of the net proceeds of the sale of Securities so withdrawn, * * *.

The managers agreed not to mortgage, pledge, or encumber the fund or any part thereof or to permit encumbrances to be placed against it. Separate accounts were kept for the individual participants and statements thereof rendered to them.

No meeting of the participants was ever held nor was any organization of them ever effected. There were no bylaws promulgated to control their concerted action. The managers' powers and duties were definitely set forth in the indenture and no enlargement or curtailment thereof was permitted except by a proposed amendment from which any participant might dissent and, in that event, such dissent was equivalent to a request for the redemption of his certificate. Upon the resignation or death of a manager provision was made for the selection of his successor by the surviving managers. The managers never held regular meetings and no provision was made for such procedure. No minutes were kept of the actions taken by the managers.

On or about March 15, 1928, the managers of the fund filed on its behalf a "fiduciary return of income" on form 1041 for the year 1927, with the collector of internal revenue of the second district of New York. On December 24, 1928, the managers wrote to the re-

spondent requesting a ruling as to whether they should file a return for the year 1928 upon the form of a return provided for use by a trustee or that provided for corporations.

On March 15, 1929, the managers filed a return for the year 1928 on form 1041, as they had done for the preceding year. On March 30, 1929, the respondent wrote to the managers a letter later known as G. C. M. 6114, which held the fund to be an association. Prior to March 15, 1930, the managers delivered or mailed to each participant a notice that he should report as "dividends" in item 9, form 1040, the amount shown as the total income derived from his ownership of the fund certificates in accordance with the statement inclosed with the said notice.

On March 15, 1930, the managers filed a fiduciary return on form 1041 for the year 1929 similar to that filed for the preceding years. On or about July 23, 1930, the respondent received from his general counsel a ruling, later known as G. C. M. 8386, in which a change of interpretation by the general counsel was indicated and recommendation was made that petitioner be notified that it was held to be a strict trust. On August 11, 1930, the managers wrote to the respondent reciting the history of the trust, describing its operation and agreeing to indemnify the Government for any loss of tax if the fund should be held to be a trust and not an association. On October 17, 1930, the respondent notified the petitioner that, upon reconsideration, he held it to be a strict trust for the years 1927 and 1928, and on October 25, 1930, the respondent directed the petitioner to disregard certain proposed additional taxes for those years. On October 28, 1930, the petitioner requested the respondent to issue a ruling to cover the years 1929 and 1930. On November 11, 1930, the respondent, by letter later known as G. C. M. 8804, replied that if the same conditions obtained as during the years 1927 and 1928 the fund had the taxable status of a revocable trust.

On or about December 12, 1930, the managers delivered or mailed to each certificate holder a letter stating that the United States Treasury Department had held the fund to be a strict trust and advising him to include in his amended returns for the years 1928 and 1929 his proportionate part of a reserve retained by the managers to cover additional taxes claimed by the Government and thus released by the said ruling. The amount received from the fund by the certificate holders was designated "dividends." Certain of the participants filed their amended returns in accordance with such instructions and paid their income taxes thus increased. There were about 680 participants in 1929.

Before December 31, 1929, the managers of the fund set aside a reserve out of income of the fund in the amount of $107,142.80 to cover the payment of any income taxes which might be held to be

due by the fund for the year 1929. In preparing the "Fiduciary Return of Income" on form 1041 for the year 1929 which was filed on March 15, 1930, the total amount of dividends shown on line seven of said return was $100,736.03 instead of $207,878.83, the difference representing the above mentioned reserve. After receipt from the Commissioner of the letter dated November 11, 1930, the managers of the fund credited back this reserve to the income of the fund.

On December 17, 1930, the managers filed on behalf of the fund an amended return on form 1041 for the year 1929. In that return they increased the amount of "dividends" from $100,736.03 to $207,-878.83 by adding the amount of the reserve withheld. The amended return disclosed the names of the participating certificate holders for 1929 and their respective proportions of the total income of the petitioner for that year. The return set forth the amount of interest received from bank deposits, notes, and corporation bonds, the amounts received as profit from the sale of real estate, stock, bonds, etc., and the total dividends received on stock of domestic corporations. The entire income of the petitioner was comprehended under those three headings. Certain deductions were claimed and itemized under schedule E.

There was introduced in evidence as respondent's exhibit a document prepared on form 1120 (Corporation Income Tax Return), on the face of which is stamped "Substitute Return." The stamp indicated that it was prepared by A. O. Brown and approved by A. B. Niess, neither of whom was identified in the record. The document bears the notation: "Return filed as Fiduciary now considered an association taxable as a corporation." No date of filing appears on the return but a stamp thereon headed "Audit Law Division" bears the words and symbols "Basis O. A. or R. A. R. 4-27 1931." No explanation of these symbols was made. The return contains no figures relating to gross income deductions and computation of tax but written across its face appears the notation "Original 1041 Return attached."

On March 8, 1934, the respondent informed the petitioner's counsel that the ruling of November 11, 1930, (G. C. M. 8804) had been revoked. On March 9, 1934, the respondent mailed the notice of deficiency to the petitioner stating, among other things, that the petitioner was held to be an association and that such notice of deficiency was issued under authority of the provisions of section 275 (c) of the Revenue Act of 1928.

The fundamental question at issue is the character of the petitioner, whether it is a trust or an association, but since the statute of limitations may bar the assessment and collection of the proposed deficiency we will first consider the latter situation.

**44**

The provisions of the Revenue Act of 1928 pertinent to the issue are set forth below.[1]

The petitioner filed its return for the year 1929 on March 15, 1930, using form 1041 for the purpose. It is obvious if the return so filed, or the amended return filed December 17, 1930, was a return under the law, that under section 275 (a), providing for assessment within two years, the notice of deficiency was too late. However, the respondent asserts that the return filed March 15, 1930, was made as a trust and not as a corporation; that the petitioner was, in fact, a corporation; that the return prepared by him for the petitioner on a corporate return, form 1120, was the correct return; that conditions imposed by section 275 (c) were fulfilled; and that, therefore, the notice was timely sent within the four-year period thereof.

In *Abraham Werbelovsky, Executor*, 8 B. T. A. 442, we faced a comparable question. We there observed: "Does the fact that the executor * * * in filing 'a return of the income' used Form 1041 instead of either Form 1040 or 1040A place the estate in the position of having failed to file a return within the meaning of the words 'or of a failure to file a return' as used in section 278 (a) of the Revenue Act of 1924? We think not. The estate did file a return." To the same effect are *Estate of F. M. Stearns*, 16 B. T. A. 889; and *J. R. Brewer, Administrator*, 17 B. T. A. 704. The principles underlying these cases were enunciated by the Board as early as *Mabel Elevator Co.*, 2 B. T. A. 517, where we stated:

It is urged that since the return filed by the taxpayer was made upon a fiscal year basis, while the law required a return upon a calendar year basis, the return filed was not the return required by the law and could not operate to start running the statutory period of limitations. With this we can not agree. The return filed purported to be made in accordance with the law; it purported to and did include the income of the taxpayer for the period in question. In the absence of any evidence or claim that such return was false or fraudulent with intent to evade tax, it became the duty of the

---

[1] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Except as provided in section 276—

(a) *General rule.*—The amount of income taxes imposed by this title shall be assessed within two years after the return was filed and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

(b) *Request for prompt assessment.*—In the case of income received during the lifetime of a decedent, or by his estate during the period of administration, or by a corporation, the tax shall be assessed, and any proceeding in court without assessment for the collection of such tax shall be begun, within one year after written request therefor * * *.

(c) *Corporation and shareholder.*—If a corporation makes no return of the tax imposed by this title, but each of the shareholders includes in his return his distributive share of the net income of the corporation, then the tax of the corporation shall be assessed within four years after the last date on which any such shareholder's return was filed.

SEC. 276. SAME—EXCEPTIONS.

(a) *False return or no return.*—In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

Commissioner to determine, within the time provided by law, whether or not such return was erroneous in any respect.

There can be no doubt that such limitations are placed on assessments for the purpose of assuring the taxpayer, who has made an honest return, that after such period his tax liability will not be reopened; otherwise the business of the country would always have before it the threat of additional taxes against the income of years long past whenever a new theory for interpreting the tax law or for the application of accounting principles occurred to the taxing authorities. If the limitation can be avoided on the plea that the return filed was not such a return as is required by law, although filed in good faith, there is no such assurance for the taxpayer and the limitation becomes of doubtful value at least. If the statute requires any interpretation great weight must be given to the purpose which it was obviously intended to accomplish.

The conclusive word on the matter is found in *Zellerbach Paper Co.* v. *Helvering*, 293 U. S. 172, where Mr. Justice Cardozo observed:

* * * Perfect accuracy or completeness is not necessary to rescue a return from nullity, if it purports to be a return, is sworn to as such (*Lucas* v. *Pilloid Lumber Co.*, 281 U. S. 245, 50 S. Ct. 297, 74 L. Ed. 829, 67 A. L. R. 1350), and evinces an honest and genuine endeavor to satisfy the law. This is so though at the time of filing the omissions or inaccuracies are such as to make amendment necessary.

The return on form 1041 which was filed by petitioner contained all of the information which would have been contained on a return filed as a corporate return, except for the computation of the tax. That it contained all the information which the Commissioner deemed necessary in order to assess income taxes against the petitioner as a corporation appears from the fact that when the Commissioner prepared his "substitute return" on form 1120 he inserted no figures whatsoever but merely annexed to such form petitioner's return on form 1041.

Nor can we concur in the statement of respondent found in his brief that the action of the petitioner "does not appear to come within the intent of the courts of 'an honest attempt to comply with the law'." At the expense of repetition, the facts may be recapitulated. The petitioner had filed, on March 15, 1928, a fiduciary return for 1927. On December 24, 1928, it wrote respondent asking what type of return it should file for 1928. Receiving no reply, it filed, on March 15, 1929, a fiduciary return, as it had done for 1927. On March 30, 1929, respondent notified petitioner it was held to be an association taxable as a corporation. On March 15, 1930, petitioner filed a fiduciary return for the preceding calendar year. After some correspondence the respondent on October 17, 1930, notified petitioner that it was held, upon reconsideration, to be a strict trust for 1927 and 1928, and on November 11, 1930, conforming to a request for further ruling, respondent stated that if the

conditions were the same as in the two preceding years, petitioner should have the same status for 1929 and 1930 as for the years 1927 and 1928. Its judgment in having filed, on March 15, 1930, a fiduciary return rather than a corporate return being thus vindicated by the Commissioner's revised ruling, it filed, on December 17, 1930, an amended fiduciary return for the year 1929 in which return petitioner revised the income returned and disclosed the names of all participating certificate holders. It also gave all other pertinent information essential to the assessment of tax.

Thus, not only did petitioner attempt to comply with the law as it understood it, but it actively sought the assistance of the respondent in the interpretation of the law, the better to comply therewith. If there be any doubt, and we entertain none, as to whether or not the return on form 1041 filed on March 15, 1930, for the taxable year 1929 was sufficient to start the running of the statute, certain it is there can be no doubt that the statute was invoked by the filing on December 17, 1930, in precise accord with the Commissioner's then recent ruling, of the amended return. Since the date of this amended return was more than two years prior to the issuance of the notice of deficiency, it is obvious that as to such amended return the statute has run.

Although the above is sufficient to dispose of the instant proceeding, it may be further observed that it was held in *Heffernan* v. *Alexander*, 48 Fed. (2d) 855, that the filing by the Commissioner of a return on behalf of the taxpayer as effectively starts the running of the statute of limitations as though the return were made by the taxpayer himself. See also *Douglas L. Edmonds, Administrator*, 31 B. T. A. 962. Such a conclusion would seem to flow logically from the concluding provision of paragraph one of section 3176, Revised Statutes.[2] Thus, albeit the evidence is insufficient to establish that the document referred to above as a "substitute return" constituted a sufficient compliance with the requirements of section 3176, Revised Statutes, under which we assume respondent's agents purported to act, under the cited cases, this very "substitute return" were it sufficient, would start the period of limitation. The document bears no date of official filing. There appears on its face, however, the date of April 27, 1931, in a stamp of the "Audit Law

---

[2] SEC. 3176. If any person, corporation, company, or association fails to make and file a return or list at the time prescribed by law or by regulation made under authority of law, or makes, wilfully or otherwise, a false or fraudulent return or list, the collector or deputy collector shall make the return or list from his own knowledge and from such information as he can obtain through testimony or otherwise. In any such case the Commissioner of Internal Revenue may, from his own knowledge and from such information as he can obtain through testimony or otherwise, make a return or amend any return made by a collector or deputy collector. Any return or list so made and subscribed by the Commissioner, or by a collector or deputy collector and approved by the Commissioner, shall be prima facie good and sufficient for all legal purposes.

Division". The normal inference from the dated stamp is that the "substitute return" must have been prepared and on file (if it ever was filed) in the office of the Commissioner prior to the quoted date which, in turn, is more than two years prior to the issuance of the notice of deficiency. Accordingly, if any standing be given to the same it is fairly inferable from such evidence as we have that the "substitute return" on which the respondent relies operated to invoke the statute which bars assessment and collection of the proposed deficiency.

There is no suggestion in the record in this case that the managers of petitioner were guilty of fraud, misrepresentation, or bad faith. Quite the contrary, the record discloses that they made every effort to secure an authoritative ruling by the respondent as to the status of the fund and that they explained in elaborate detail its purpose, character and method of operation. They further agreed to reimburse the Government for any taxes which it might lose by reason of closing agreements or otherwise if the petitioner should be held to be a trust. Thus, the petitioner's conduct neither evidences nor imputes bad faith.

From the facts before us, we conclude that the return filed by petitioner on March 15, 1930, was sufficient to start the running of the statute of limitations and that the assessment and collection of the taxes contemplated by the notice of deficiency mailed March 9, 1934, were barred by such statute. This holding makes it unnecessary to discuss the history, purposes and scope of section 275 (c) relied on by respondent. Sufficient to say, the section is not applicable under the facts here present. A return was filed by taxpayer which we have held was sufficient to start the running of the statute.

Our conclusion above obviates the necessity of considering other issues raised by the taxpayer.

Reviewed by the Board.

*Decision will be entered for the petitioner.*

---

TURNER, dissenting: I am unable to agree with the majority opinion in its holding that the filing of a fiduciary return of income on form 1041 for the year 1929 by the petitioner, started the running of the statute of limitations. Such a return is an information return and is not a "return of the tax imposed by this title" within the meaning of section 275 (c) of the Revenue Act of 1928, which provides that "if a corporation makes *no return of the tax imposed by this title,* but each of the shareholders includes in his return his distributive share of the net income of the corporation, then the tax of the corporation shall be assessed within four years after the last date on

which any such shareholder's return was filed." (Italics supplied.) The evidence in this case shows that only a portion of the petitioner's shareholders filed amended returns, including therein their distributive shares of petitioner's net income, even though instructed by petitioner on or about December 12, 1930, to do so. Thus there is no proof that the period of limitations provided in section 275 (c) had run prior to the mailing of the notice of deficiency herein. On the other hand, if the return or returns upon which the period of limitation prescribed by section 275 (c) is based have not been filed, this is a no-return case and under section 276 (a) the tax may be assessed at any time.

It is to be noted that section 275 (a), designated as the general rule, prescribes the period of limitation on the assessment and collection of tax in the ordinary case, while section 275 (b) and (c) covers the cases wherein Congress has recognized the presence of special conditions and circumstances which justify the fixing of different periods of limitation. The exceptions to the periods of limitation so prescribed are set forth in section 276. We have held that the filing of a fiduciary or information return, as distinguished from a tax return, and not predicated upon a liability to tax, but which furnishes information as to income, is the filing of "a return" within the meaning of section 275 (a) and starts the running of the period of limitations in cases where that section is applicable. *Abraham Werbelovsky, Executor*, 8 B. T. A. 442; *Estate of F. M. Stearns*, 16 B. T. A. 889; *J. R. Brewer, Administrator*, 17 B. T. A. 704. See also *Hartford-Connecticut Trust Co.* v. *Eaton*, 34 Fed. (2d) 128. None of these decisions was made, however, in a case where the provisions of section 275 (c) were under consideration and none undertakes to define the term "return of the tax imposed by this title", used in that provision of the statute.

Section 275 (c) first appeared in the Revenue Act of 1926 and the reason for its enactment is stated on page 11 of House Report No. 1 of the Committee on Ways and Means, 69th Congress, 1st Session, as follows:

This section provides that if a corporation makes no return of the tax imposed by this bill, but each of the shareholders includes in his return his distributive share of the net income of the corporation, then the tax of the corporation shall be assessed within four years after the last date on which any such shareholder's return was filed. This provision is limited to taxes imposed under this bill, and it is incorporated in the bill to make certain that if in the future the beneficiaries of a trust or the members of an association include their distributive share in their income-tax return, and if at a later date it should be held that the trust or association is subject to the corporation tax and should have made the return, the statute of limitations as applied to the trust or association shall run from the dates above specified.

In considering the applicability of section 275 (c), we can, of course, eliminate a case where a "return of tax" as distinguished from an information return has been filed, since in such a case section 275 (c) by its own terms would not be applicable and the limitation in section 275 (a) would clearly apply. The Board holds here that the filing of an information return brings this case within the provisions of section 275 (a) and also renders section 275 (c) inapplicable. If this interpretation is correct we must read out of section 275 (c) the words "of the tax imposed by this title" used by Congress in describing the return there dealt with and say that if no return of any kind was filed by the association, section 275 (c) would be applicable. Accordingly, Congress could have saved itself the trouble of describing or limiting the term "return" as it is used in section 275 (c) and would have accomplished exactly the same purpose, under the reasoning of the majority opinion, if it had merely said, "If a corporation makes no return but each of the shareholders includes in his return the distributive share of the net income of the corporation, etc." In *Gilbert* v. *Commissioner*, 56 Fed. (2d) 361, the court said: "It is a well-settled rule of construction that a statute should, if possible, be so construed as to give meaning to all parts of it", and in *Crooks* v. *Harrelson*, 35 Fed. (2d) 416, the court said:

To hold thus would be to wipe out a plain distinction made by the statute itself, and which has existed in many jurisdictions; to hold thus would also violate one of the primary canons of statutory constructions—that each clause and each word of a statute should, if reasonably possible, be given meaning and effect.

And later the Supreme Court in the same case, 282 U. S. 49, said:

* * * The courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter, *Monson* v. *Chester*, 22 Pick. (Mass.) 385, 387.

We can not ignore the plain language of the statute and say that Congress meant nothing by adding to the term "return" the limiting words "of the tax imposed by this title", and this we must do in order to reach the conclusion contained in the majority opinion. We are not justified in ignoring the plain and unambiguous language used by Congress in the provision of the statute which specifically governs and fixes the period within which the tax of an association or trust, taxable under the revenue acts as a corporation, may be assessed. In my opinion, Congress recognized

the difficulties often confronting the Bureau of Internal Revenue in determining whether a particular trust or association was such that under the terms of the revenue acts it was to be taxed as a corporation and by this provision of the statute prescribed a longer period of time for the determination of the tax in cases where such associations filed information returns than was allowed where a "return of the tax" was filed. On the other hand, the members of a trust or association were provided with a method whereby they could, by reporting their distributive shares of income in their individual returns, relieve themselves of any burden which might be occasioned by undue delay in the determination of the taxable status of the trust or association. If this was done, Congress said that the Government should be limited to four years in making a determination and assessment of the tax. Furthermore, this placed no additional burden on the members of such a trust or association, since in taking the position that the trust or association was not such as to be taxable as a corporation, they admitted the duty on their part of reporting their distributive shares of income of the trust or association in their individual returns. Under the plain terms of the statute, we are not at liberty to hold that the filing of an information return, in a case such as we have here, caused the running of the period of limitation prescribed by section 275 (a) for by such construction we read out of section 275 (c) clear and unambiguous language which Congress saw fit to place there. This we may not do. *Crooks* v. *Harrelson, supra; Gilbert* v. *Commissioner, supra; In re Matthews*, 109 Fed. 603.

MURDOCK agrees with this dissent.